WABASH SMELTING, INC. *v.* MURPHY, D/B/A
MURPHY TRUCKING CO., ET AL.

[No. 19,733.   Filed December 12, 1962.   Rehearing denied
January 7, 1963.]

*Thomas D. Logan, Rothberg, Gallmeyer, Strutz, Fruechtenicht & Logan,* of Fort Wayne, for appellant.

*James H. Pankow,* and *Jones, Obenchain, Johnson, Ford & Pankow,* of South Bend, for appellee, Elvin Murphy, d/b/a Murphy Trucking Co.

*Frank V. Dice,* and *Dice & Keith,* of Peru, for appellee, Charles Roy Earl.

MYERS, J.—This is an appeal by appellant, Wabash Smelting, Inc., from an award of the Indiana Industrial Board in favor of appellee, Charles Roy Earl, and against both Wabash Smelting, Inc., and Elvin Murphy, d/b/a Murphy Trucking Co.

The case arose as the result of an accident which took place January, 6, 1960, wherein Earl, while driving a truck owned by Murphy, on business for appellant, suffered injuries and temporary total disability. No question is raised concerning the extent of the injuries, the amount of the award, or that the accident arose out of and in the course of employment. There are two main issues presented in this appeal: (1) Whether the Industrial Board had jurisdiction to enter the award; and, (2), if so, whether appellee Earl was in the employ of appellant, or Murphy, or both.

As to the jurisdictional question, we find these facts from the record: Earl's application as an injured employee for an award was filed with the Board on February 13, 1961. Appellant and Murphy were named as parties defendant in the title of the application. In the body of the application, Elvin Murphy, d/b/a Murphy Trucking Co., with the address of Denver, Indiana, is named as "defendant employer." Appellant is named as a party having an interest in the application to be joined either as plaintiff or defendant. On March 15, 1961, Murphy filed its appearance by letter addressed to the Secretary of the Board. On June 20, 1961, the cause came on for trial

and hearing before a single Hearing Member of the Board at Fort Wayne, Indiana. On June 23, 1961, before any findings or decision had been made, appellant filed with the Board a pleading designated as "Notice for a Mistrial." This was signed by appellant's president, and, in substance, stated that he had carefully interrogated all of the employees of his company, and, upon his own information and belief, stated that neither the corporation nor any of its employees had received any notice of the filing of the application for compensation; that the records of the Board showed that a mailing took place to Wabash Smelting Co., Railroad Street, Wabash, Indiana, when in truth and in fact the name of the corporation was Wabash Smelting, Inc., located on Factory Street, in Wabash. He claimed this to be in violation of §40-1509, Burns' Ind. Stat., 1952 Replacement (Supp.), §40-2220 (c), Burns' Ind. Stat., 1952 Replacement, and §9 of the Rules of Procedure of the Industrial Board of Indiana. He prayed that any proceedings theretofore had be declared null and void, the hearing determined a mistrial, and a new hearing had.

On the same day, the attorney for Earl filed an "Affidavit Opposing Motion for a Mistrial." It recited that appellant was present at the hearing on June 20, 1961, being represented by counsel; that appellant took part therein, presenting books, records and contracts which related to Earl's employment, examining and cross-examining witnesses, and otherwise interposing its defense; that a subpoena had been issued by the Board to appellant on June 13, 1961, without reference to address, which was duly served on the vice-president of appellant, which showed on its face that appellant was a party to the action; that this subpoena was honored by appellant, who

raised no question concerning it, and, furthermore, that appellant accepted $4 as an advance witness fee. It was claimed that appellant by these actions waived any question as to notice.

The Board's Hearing Member made no ruling on the motion for mistrial. However, on June 30, 1961, he entered his findings and award. In so doing he stated ". . . that pursuant to notice fixing the time and place therefor," the claim was set for hearing, and that each of the parties, being Earl, Murphy and appellant, was represented by counsel.

An Application for Review by the Full Board was filed by Murphy on July 5, 1961, and by Earl on July 7, 1961. On July 10, 1961, appellant filed an Application for Review by the Full Board on the grounds that the award was not sustained by sufficient evidence and was contrary to law. It is to be noted that in this application appellant designates itself as a party defendant.

On July 18, 1961, appellant filed a "Petition for Continuance of Time to Appeal." In this petition it was stated that neither the attorney nor any other agent for appellant was notified of the decision of the Board dated June 30, 1961, but learned only on July 7, 1961, that such an order had been entered. A request for an extension of time within which to file an Application for Review by the Full Board was made. Appellant comments that the Board did not rule on this petition. It may be inferred that the Board felt no necessity to rule on this peculiar and confusing petition, as the Application for Review by the Full Board had already been filed by appellant more than a week prior thereto.

On October 9, 1961, the matter came before the Full Board, and on October 18, 1961, an award was made which stated, *inter alia,* that the hearing was held pursuant to notice fixing the time and place therefor, and that each of the parties appeared by attorney including appellant. The findings and award were substantially the same as those of the Hearing Member and were in favor of Earl against both Murphy and appellant. This appeal followed.

Appellant's assignment of errors is based upon the following grounds: That there was error in failing to grant appellant's "affidavit" and motion for mistrial; that the award was not sustained by sufficient evidence and was contrary to law. Cross-assignment of errors was filed by appellee Murphy, specifying that the award was not sustained by sufficient evidence and was contrary to law.

The record reveals that at the time of hearing, being June 20, 1961, appellant entered a general appearance by its attorney. The Hearing Member started the proceedings by asking this question: "Gentlemen, are you ready to proceed with this claim: Charles Roy Earl versus Murphy Trucking Company, and Wabash Smelting Company?" No objection was introduced by appellant. Then, by stipulation of all three parties, Earl's hospital bill, doctor bills and ambulance bill were introduced into evidence. As to the hospital and doctor bills, appellant's attorney specifically stated that there was no objection from appellant. Next there appears a colloquy among the lawyers, and reference is made by Earl's attorney to "this insurance company," and it was suggested that they go off the record and tell the Hearing Member about it. Mention was made that "Michigan Mutual, the carrier, is accountable for it." Thereafter, appel-

lant's attorney made the following statement, which is heavily relied upon by appellant:

"Your Honor, the Wabash Smelting Company has never received any notice of the hearing but we have presented ourselves in Court in response to a subpoena duces tecum, which was served some days prior. The Wabash Smelting Company has never been notified in the manner required by law, but we have presented our appearance in Court only with the understanding that our insurance carrier had properly been notified. I have been informed by phone the insurance company has not been notified either. I now object to any proceedings herein which would have any effect on Wabash Smelting Company."

There was no ruling on this objection.

The Hearing Member then requested the attorneys to proceed with their stipulations. These included the stipulation that appellant on March 18, 1960, had mailed a notice to Michigan Mutual Liability Company, together with a Form 24, the same being an Employer's Report to the Industrial Board of Indiana of an Injury to an Employee, and in due course received a reply relative to the pendency of the matter.

Testimony was heard, with appellant's attorney examining and cross-examining the witnesses and making various objections. The record is replete that he took an active part in the hearing as appellant's attorney.

Appellant has specified three gounds of error in its assignment of errors (*supra*). Attention is called to the fact that in presenting a review of the Board's decision to this court, the statute reads as follows:

"An assignment of errors that the award of the full board is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the award and the sufficiency of the

evidence to sustain the finding of facts." Burns' Ind. Stat., §40-1512, 1952 Replacement.

This is the only avenue of review by this court, and all alleged errors must be presented thereunder. *LaReau* v. *Teibel et al. etc.* (1956), 127 Ind. App. 92, 138 N. E. 2d 153; *Webster* v. *Indiana Department of Public Instruction* (1962), 132 Ind. App. 595, 178 N. E. 2d 909. Thus we will only consider whether the decision of the Board is contrary to law.

Appellant argues that the Board did not acquire jurisdiction over appellant because notice of the time and place of hearing was not sent as required by law; that appellant never received any notice of the filing of the application for compensation; that the Board failed to send appellant a copy of the award of the Hearing Member. Appellee Earl contends that, even if this were so, appellant waived its right to notice by having its attorney enter a general appearance, engage actively in the hearing, and then appeal the decision to the Full Board.

A close scrutiny of the record reveals no evidence, either documentary or testimony of witnesses, to the effect that these notices were not sent out to appellant by the Board. In order to substantiate its position, appellant cites the "Notice for a Mistrial" and the "Petition for Continuance of Time to Appeal." Appellant treats these as "affidavits" in its brief, but the transcript shows that neither of them was sworn to under oath. The "Notice for a Mistrial" lacked the signature of a Notary Public and the "Petition for Continuance of Time to Appeal" had no jurat at all. At most, these documents may be treated as pleadings, although the "Notice for a Mistrial" appears to be a clumsy and unorthodox manner in which to

raise a jurisdictional question, and the "Petition for Continuance of Time to Appeal" was useless and meaningless in view of the fact that an Application for Review by the Full Board had already been filed some eight days prior thereto.

In either event, they cannot be considered as evidence of a failure to give notice. As unsworn statements, they are of no avail at all. As unverified pleadings, they constitute no proof of the facts they allege. See 32 C. J. S., Evidence, §633 b., p. 485 *et seq.*

Likewise, the unsworn declaration of appellant's attorney at the hearing must be rejected as evidence. The reason for all of this is that such statements fall within the hearsay rule. A party cannot manufacture evidence for himself. Self-serving statements or declarations by the party or his attorney not under oath cannot constitute any evidence of the facts they allege. See *State* v. *Schaller* (1942), 111 Ind. App. 128, 135, *et seq.*, 40 N. E. 2d 976; 31 C. J. S., Evidence, 216, p. 957.

We believe that the crux of the matter is that appellant waived all such notices by having its attorney attend the hearing, enter a general appearance, stipulate certain facts without objection, examine and cross-examine witnesses, make objections throughout the proceedings, and then file an Application for Review by the Full Board after receiving an adverse decision. It is settled law that in a trial by the court, ". . . where there is an appearance, without objection, or, indeed, where there is any act indicating consent, want of notice will be deemed waived." *Cleveland* v. *Obenchain* (1886), 107 Ind. 591, 594, 8 N. E. 624. We think the same rule applies in cases before the Industrial Board such as this one.

As to the question of employment at the time of Earl's accident and injury, appellant claims that he remained an employee of Murphy. Murphy argues that Earl had left Murphy's employment and had entered the employment of appellant. The Board found that they were simultaneous employers and rendered an award of compensation against both.

Among the stipulations that the parties agreed to at the hearing, it was stated that Earl was employed by Murphy as a full-time truck driver prior to Januay 6, 1960; that his pay consisted of a percentage of the revenue for each haul that he made. They also agreed that on January 6, 1960, appellant leased from Murphy the truck involved in the accident.

The evidence reveals that appellant was in the business of smelting aluminum which involved hauling materials by truck. In cases where extra equipment was needed, it had been customary for Murphy to lease to appellant a truck pursuant to the terms of a written agreement executed by the parties in each such transaction. One of Murphy's drivers would be assigned to drive the truck to appellant's place of business, where he would check in, receive his instructions, load the truck, drive it to its destination, unload, pick up a return load and come back to appellant's place of business. During this time the driver would be placed on the pay roll of appellant and paid on a mileage basis by appellant when the trip was completed. Murphy selected the driver who was to make the trip. Appellant had no control over the selection of the truck or the driver. Although in theory it could have rejected the truck and sent it back to Murphy without using it, in practice this had never happened. Appellant exercised no control over the driver or any change of drivers other than to desig-

nate his load and destination and lay out his trip. It had no power to hire or fire any of Murphy's drivers.

Earl testified that he was sent by Murphy in a truck shortly after midnight on January 6, 1960, to appellant's offices. He reported to a foreman who gave him instructions on a slip of paper which "said where the load went and after unloaded we were to go to pick up a load and it said where and the time we left and the time we were to arrive at destination." This was signed by appellant's Director of Properties. Earl knew the truck had been leased by Murphy to appellant and carried a signed copy of the lease in his cab. This particular instrument was destroyed in the wreck which took place, but it was similar to a printed form commonly used between the parties, a copy of which was introduced into evidence.

Earl previously had made other trips for appellant under such a lease agreement, and this trip was no different from any of the others. The first trip he made, appellant's Director of Properties had interviewed him and caused him to fill out an application "just like I was hired out any place." When he made his appearance at appellant's place of business on January 6, 1960, it was not known that he was to be the driver. As an employee of Murphy's, he had been instructed how to drive and move the truck. Appellant did not give him any instructions as to method of operation, the speed he was to maintain or any other particulars. He was only told to haul a truckload to its destination.

The lease agreement, in substance, provided that Murphy deliver and lease the truck to appellant and keep it in proper mechanical and operating condition, furnish all fuel, oil, tires, grease, parts, and equipment, and, in the event of a breakdown, replace it

with a substitute vehicle. Murphy also was to pay all fees and taxes assessed against the vehicle. In consideration therefor, appellant agreed to pay Murphy on the basis of thirty cents a mile computed from actual road map mileage. It did not assume responsibility for loss or damage to the truck in the event of fire, collision or other casualty. There was a provision that appellant would maintain adequate insurance coverage against liability for personal injuries and property damage to others. It was also agreed that each leased vehicle would have a sign affixed to each side showing that it was leased to and being used by appellant.

Murphy argues that Earl became a special employee of appellant under the "loaned servant" doctrine and left Murphy's employment when he went to appellant's place of business under the loan lease arrangement. Appellant claims it had no control over Earl during his trip sufficient to create an employer-employee relationship, and that, consequently, at all times he remained in the employment of Murphy. Both parties support their argument by citing the case of *Jackson Truck Co.* v. *Interstate M. F. System* (1952), 122 Ind. App. 546, 104 N. E. 2d 575.

In that case, two carriers operating under a lease agreement similar to the one involved here were found liable to pay compensation for the death of claimants' decedent, a driver who had been killed accidentally in the course of his employment. This court stated that the real and decisive test of employment under such circumstances is who had the power or right to command the act and to direct and control the means, manner or method of performance, and to whom was the driver accountable upon arrival at his destination. The opinion determined

that both carriers were employers who had associated themselves together and were in direct control of the employee so that he was considered the employee of both carriers.

There are sufficient facts in the record of the case at bar from which the Board could have drawn the conclusion that both appellant and Murphy are jointly liable for compensation under the holding in the *Jackson* case, *supra*.

Pursuant to the terms of the lease, Murphy retained ownership of the vehicle as a lessor. It was responsible for maintenance, upkeep and repair and was liable for any loss or damage during the term of the lease. It also agreed to pay all federal, state and local taxes assessed against the truck during the period of the lease. Signs had to be affixed to the sides of the vehicle showing it was leased to and being used by appellant. Thus Murphy retained close control over the truck itself while it was on a lease trip.

To drive this vehicle, Murphy selected a driver. In this case it was Earl, who was one of Murphy's "regular" drivers. Appellant had no choice as to who was to operate it when on lease. It took whatever driver Murphy sent. Appellant could not discharge Earl, but could reject the equipment if it so desired. Murphy instructed Earl how to drive and move the truck, while appellant did not. When a lease trip was completed, Earl returned to Murphy as one of the "regular" drivers.

In so far as appellant is concerned, it interviewed Earl the first time he was sent on a lease trip and had him to fill out an application as if he were being hired to drive. During each lease trip his name was placed on appellant's pay roll and at the end of the trip he was paid by appellant. His pay was the same

as that paid to him by Murphy. Appellant made a lay-out of Earl's trip, told him where to go, what load to haul, where to unload it and what return load to pick up and bring back. Appellant's Director of Properties said he had complete control over whether or not to use the equipment after it was leased, and that it was appellant's to do with as it saw fit until it was returned to Murphy. Murphy had no part in directing Earl what to haul or how to make the trip. This was a matter strictly within control of appellant.

Under these circumstances, we are constrained to hold that both Murphy and appellant fall within the "real" and "decisive" test set forth in the *Jackson* case, *supra*, as therein based on the case of *Uland* v. *Little* (1949), 119 Ind. App. 315, 82 N. E. 2d 536.

The evidence presented to the Board does not establish the same or identical control in both appellant and Murphy, but it is sufficient to demonstrate a mixed control, not necessarily complete in either, over the truck, Earl, and the manner, means and method of his performance. *Long* v. *Sims Motor Transport Co. et al.* (1954), 124 Ind. App. 504, 117 N. E. 2d 276.

Award affirmed.

Cooper, C. J., and Ax and Ryan, JJ., concur.

NOTE.—Reported in 186 N. E. 2d 586.